John Rizzio-Hamilton Plaintiff Appellant The District Court erred in holding that Plaintiff failed to plead facts, giving rise to a strong inference of scienter. I'll begin with the issue of misstatements and omissions. The statements at the heart of this case concern Six Flags' timetables for opening three large-scale theme parks in China, as well as statements asserting that Six Flags was making construction progress in accordance with those stated timetables. The complaint alleges that these statements were false, because throughout the class period, it was impossible for Six Flags to achieve those timetables, and because no meaningful construction was in fact occurring. The basis for these allegations, principally, was former Employee One. Former Employee One was well-positioned to know the facts that he reported. He was Six Flags' Director of International Construction and Project Management from May 18 to September 2019, during much of the class period. His job was to oversee the construction and progress of the China parks and to report on their construction upward through the organization. Can you explain how the international parks, being such a small percentage of Six Flags, would have such a huge effect on the stocks? I mean, you all basically said it was a 50% cut or something like that over the two years. How could that happen as a result of this very small 3%, if I'm remembering right, portion of their company? The reason that the impact on the stock price appears outsized is because this was some of, if not the most profitable revenue of the company. This revenue was 80% and 90% profit because Six Flags didn't have to bear capital expenditures to produce these parks. They were produced by the partner, Riverside. As a result of that, the construction of these parks had the potential to increase the company's EBITDA, which is a pre-tax measure of profitability, by about 60%. And thus, these projects were identified as one of the five key growth drivers for the company. So even though the revenue slice was small, it had an outsized impact on the profitability of the company and therefore dramatically impacted the stock price when the adverse facts were belatedly disclosed. There's a lot in this case, and you probably have a path you want to take. Perhaps I should just let you go that way, but I'm not going to. I have a couple of questions for you. One is, you're very familiar with Judge Pittman's opinion more so than I am, but it does seem to me that a significant part of his conclusion that there wasn't enough here is that the projections, and an awful lot of this was projections. How soon is something going to be finished? He found some of the allegations by former employee one to be on the conclusory side, regardless of whether, when it was actually specific, whether something was impossible to be completed by the projected deadlines or not, was not sufficiently pleaded. What do you think, first, of the adoption of a standard that you must have pled why it was impossible to complete by that particular time? And regardless, what do your pleadings say towards that? Okay. Thank you, Your Honor. So, first of all, a central allegation of the complaint is that it wasn't, in fact, impossible. So, we don't run from that standard. We plead it affirmatively. Now, what do we plead to support that assertion? We have to adopt it to make sure I'm riding this. Is that a new standard for us? I mean, it's been cited as the juniper standard out of some district court in a distant state. Is that right? Well, if you're talking about the concept of whether it was impossible for them to meet their stated timeline, that's one concept, and I can explain our basis for that allegation. If you're talking about the concept of— Why don't you stay right behind me?  I'm a mover. If you're talking about the concept of whether we had to plead that it was a certainty that Riverside would default, that's a different issue and one that actually isn't at the heart of the case because the principal statements at issue here are that the parks were going to open on these stated timetables and the construction was being made in accordance with those timetables such that they were going to be achieved. That is an issue. Those statements are true or false quite independently of whether Riverside would ultimately default because there were facts in existence on the ground at the time those statements were made that rendered the timetables impossible to achieve irrespective of whether Riverside was ultimately declared in default. Those facts were as follows, Your Honor. First of all, former employee one was quite clear about this. His report was very specific and any discounts as to his report was totally inappropriate. That's a separate legal issue. I'm happy to get to it. But he was very specific in his supporting reasons for the impossibility of achieving these timetables. He said that by the time he got there in May of 2018, Riverside had failed to pay all approximately 40 ride vendors who were contracted to construct the rides for these theme parks. And these weren't just like small theme parks. These were like the equivalent of small cities or towns. They're gigantic. They have huge rides, huge restaurants. These are big theme parks. And he said, moreover, that those rides take 36 to 60 months to complete from order. The fact that they had been canceled rendered the timetables mathematically impossible to meet because those timetables, and they varied some throughout the class period, but more or less they provided for a range of construction completion, particularly for Zhejiang and Chongqing, of approximately 18 to 24 months. And in some instances smaller than that. You're talking about 2018. Some of this gets into 2019. Was the first projected opening in 2021 for either one of these, any three of these? So the first projected opening for Zhejiang. The earliest opening. The earliest opening was late 2019. And that was the timeline that was stated between April 2018 and October 2018. So the company is saying within about 15 to 18 months, depending on where you judge it within that timeframe, we're going to open Zhejiang. It was preposterous. We have a photograph. The one thing you've mentioned so far is that the rides have been canceled. And that's a two or three-year lag time. Is there anything else that supports the impossibility? Yes, Your Honor. The second principle supporting allegation for the concept of impossibility is that Riverside had not even commissioned the blueprints necessary to construct the parks as of the time that former employee one arrived. And, in fact, throughout the entire time that he was at Six Flags up until approximately August of 2019, they still hadn't done it. One of the things that was discounted by Judge Pittman of FE1 is his knowledge of the internal operations of Riverside. Correct. How does that fit into what you just said? I respectfully submit that that is sort of fundamentally misguided because what former employee had direct knowledge of and would, in fact, make the core statements of issue. Let me just ask you. He was the employee or at least contractor, but the employee of Six Flags. He was the man on the ground in China or person on the ground in China. I don't know if we know. He's the man on the ground in China. Okay. He was the man on the ground. At an executive level. Was he the principal person for Six Flags in China overseeing these projects? The reporting structure worked as follows. He was the principal person directly overseeing the construction and the reporting up of the progress. He, in turn, reported to Dave McKillips, who was the president of Six Flags International. Okay, but all I'm getting to is he's the principal person in China or was one of these other people also in China? No, he's the principal person in China. If anybody had knowledge or needed to have knowledge, whether he had it or not, of what was going on in China, you would think, at least for purposes of pleading, this would be the person. I've been doing this a while. It is exceedingly difficult. It's almost impossible to find a witness this well-positioned at the pleading stage during the pendency of a discovery study. To hit on the button the person who is directly responsible for the facts at issue in this case is extraordinary. And it's incredibly rare to have that kind of report at the pleading stage in one of these cases. If you do say so yourself. If I do say so myself. And I will tell you the notion. So, let me just circle back to the question Your Honor had answered. He didn't need to have knowledge of Riverside's internal financial condition to report accurately facts that rendered the statements false and misleading. And the reason for that is because he had direct personal knowledge of the actions that Riverside took or failed to take that rendered the misstatements misleading and the timetables impossible. And his knowledge of those actions exists because he first-hand observed them. Irrespective of whether he has access to Riverside's internal books and records. He knew that they had cancelled, all the ride orders had been cancelled for Riverside's failure to pay because it's his job to oversee the construction process. He didn't have to know how much Riverside had in the bank to know that the rides had been cancelled. He didn't have to know how much Riverside had in the bank to know that there was zero construction progress happening. Earlier you used the word blueprint. Is that a word you used in the complaint? It is, Your Honor. It's a long complaint. So, did you allege that in China, like here, you can't build, you can't get a permit to build without construction documents? And they just didn't have them? Was that alleged? It wasn't alleged in those precise terms that you can't get a permit to build without them. This is what was alleged. That you can't complete the parks or even make meaningful construction progress toward completing the parks without these blueprints. What they had was conceptual design drawings. Like, the roller coaster is going to go here. No, I know what design drawings are. Yeah, so you know what I'm talking about. And they actually couldn't even undertake, let alone complete, undertake the construction necessary to meet the timetables without the blueprints telling them how things were going to be built. And that was the second. Yeah, because you don't have much time, and scienter to me is the more difficult issue. Thank you, Your Honor. I'll just give you two questions that I have. Please. Because in paragraph 250, you do indicate that McKillop's conveyed to the defendants his weekly reports. Yes. What's the best circuit decision that's sufficient, that's attributed to them at the motion to dismiss stage? Thank you very much, Your Honor. Okay, so there's two that I would like to speak about. Goldstein and Your Honor's decision for this court in Neiman. In Goldstein, and I'm going to use Neiman's summary of Goldstein because it's quite accurate and I think it's very illustrious. So the allegation in Goldstein was that the controller had gotten a report that contained the undisclosed adverse information. And the plaintiff sought an inference that the controller must have conveyed that report to the speaking defendants to whom he directly reported. And this circuit said that we're not going to draw that inference. What it said was lacking. And this is really critical. So forgive me for flipping through my outline, but I want to get the language exactly right. What this court said was, and I'm reading now from Neiman at page 749. The court suggested the plaintiff should have alleged that the controller presented or discussed the report with the speaking defendants. It was more than a suggestion. It went back and looked at Goldstein and the court said in Goldstein, you should have alleged that the controller presented the report to the speaking defendant. And absent that allegation, we're not going to construct a daisy chain for you. That is exactly what we allege here. In paragraphs 106 and 107 and paragraphs 249 to 252, we allege spot on that McKillips presented the weekly reports as well as the more periodic master reports to defendant Reed Anderson and the board. So we have exactly what Goldstein said we're supposed to have. We've alleged it. Furthermore, in Neiman, your Honor was confronting a situation where the facts were a little more favorable for plaintiffs, but not quite enough. There, the plaintiff asked for an inference of scienter based on an attachment to an email. And the defendant had gotten the email, but it was like this, the attachment was like this huge Excel spreadsheet of data for over 100 oil wells. And only one was at issue in the case. And the plaintiff asked the court to draw the following chain of inferences. That the executive opened the email, opened the attachment, searched through a sea of data concerning over 100 wells, found the needle in the haystack of the data concerning the one well at issue, and studied that data enough to know that it contradicted their statements. And this language is also important. This court said that there was no scienter in such a situation, quote, absent an allegation that the defendant was alerted to the data in some other way, end quote. Again, that is exactly what we have here. We have the specific allegation that the weekly reports and the master reports were presented to the speaking defendant in this case, the principal speaking defendant, defendant Reed Anderson, as well as the board. And so, you know, your honor, I think that when you look… What's the case law, and time's running out. What's the case law on scienter being undercut if the defendants didn't, if they retained their stock, they didn't sell the stock during the class period? Right. So, typically, that argument has real force when the defendant's out in the open market buying stock out of their own pocket at artificially inflated prices. Not what happened here. The stock that the defendants are relying on for this argument was stock that was awarded to them pursuant to the company's routine compensation plans. They didn't go out and buy stock at inflated prices, and they don't deserve credit. Certainly not a level of credit that would immunize them from an inference of knowledge, which is what we've pled here. And why didn't they sell? You know, defendants say in their brief, I see my time has expired. May I finish that answer? Why didn't they sell? Defendants say the key point is that they didn't sell. They didn't sell after they were awarded this stock. That is highly speculative. Maybe they didn't sell because they didn't want to trigger a stock liability, or a tax liability, rather. Maybe they didn't sell because they understood that the price was going to get hurt when the truth about the parks were disclosed, and they just wanted to ride it out and hold it longer than that. Who knows? The point, for present purposes, is at the pleading stage, the mere retention of stock awarded under a routine compensation plan does not do enough as a matter of law to defeat an inference of scienter based on knowledge when we've pled the facts we have here. Thank you, Counsel. Thank you. Good afternoon, Your Honors, and may it please the Court. Dan Salucci of Kirkland & Ellis on behalf of the defendant, Applebee's. The easiest path towards affirming this case is scienter, so I'd like to start there. Before addressing plaintiff's individual allegations, I'd like to make four points up front, which I think help frame this case and explain why it was properly dismissed on scienter grounds. First, the statements in this case concern Six Flags' contracts with Riverside, through which it was Riverside's responsibility to finance the parks, and it was Riverside's responsibility to construct the parks. The securities laws do not charge companies with guessing at what their counterparty will or will not do, and they also don't prohibit statements of optimism concerning contracts with other parties. Second, plaintiff's allegations are almost entirely dependent on the allegations of one confidential case. No, I'm sorry. The first point is the statements were all about what Riverside might do, and that's not their responsibility? Not that it's not their responsibility, just that it's significantly harder under the securities laws, I believe, based on, for example, the Express Scripts case. It's harder to prove a securities fraud claim when a party is speaking about the contractual performance of their counterparty because you're not charged with guessing what your counterparty is going to do. But what about just a general statement, there are no delays, like the April 2019 statement? I agree. That's not a complete answer to that, but I think the April— You have three others. Go ahead. No, no, no. I just— It's not a complete answer to this case. I would agree with that, Your Honor. Okay. So third, prior to and during the 22-month class period, Six Flags was very transparent. Six Flags regularly cautioned investors of the very same risks that plaintiff claims cause their losses in this case. Aren't those cautions sort of generic each time they—whatever sort of report or presentation there was? Isn't that talking about discounting? Don't you discount those sorts of warnings? I would respectfully disagree, Your Honor. I would say the Form 10-K had very specific language concerning risks about the licensing agreements. But you wouldn't call it boilerplate language? I would not call it boilerplate language. Is this .2 or .3? Sorry. Sorry, this is .3. This is .3. What was .2 again? .2 was the confidential witness, and I should probably— Oh, discount confidential witness. Not necessarily discount. I just want to make the point that this case is almost entirely derived from the allegations of one confidential witness. He's not even alleged to have worked at Riverside, and he also was not alleged to have been privy to the high-level strategy conversations that occurred between Six Flags and Riverside. If you notice in plaintiff's reply briefing, they make a lot out of the February 2019 comprehensive review. FE1 wasn't present at the table for that. They have no allegations as to what was said during that February 2019. I mean, I understand that pleadings in these kinds of cases have to be at a higher level than your typical pleadings. You've got fraud, and you've got the statute about private securities actions and so forth. But we are still at an early stage. This isn't the trial. So, I mean, it just seems a little funny to me the notion that every detail has to be out there in the complaint that you're going to, you know, eventually have to do some discovery on, and at trial you may not be able to prove. So how do you sync that up? Again, I understand this is a higher level than the typical complaint, but it can't be the same as at trial, right? It's certainly less than trial, Your Honor. I believe the standard is particularized allegations of fact that have to give rise to a strong inference of scientific error. But these were pretty particular, I realize not perfect. And that's part of why you do discovery and you depose people and you this and you that. And sometimes along the line it gets a better case and sometimes it gets worse. That's why, you know, the beginning isn't always the same as the end. I mean, in Texas you can amend your petition at will until like seven days before trial or something, and you'd see people with dozens of amendments as a result. I would respectfully disagree that these allegations are particularized. It's a 22-month class period, and throughout the entirety of the class period you have regular earnings calls where you have Reed Anderson and Barber cautioning about negative developments happening in China, and then you have the allegations from FE1 that are largely not bound in time. But now just specifically on this third point, which is negative disclosures. Yes. Where can you point to a place in your brief where you describe any negative disclosure prior to February of 2019? Yes. So the Form 10-K, the record number is A1019, and that was actually issued. Record on appeal. Go ahead. And that says that the performance of our partners and their ability to obtain financing, the impact of economic fluctuations in economies outside the U.S. and difficulties in cost of staffing, those were all specifically described risks, and those are the exact risks that came to pass. Okay. So the record on appeal as to that 10-K and the date of it was what? So the 10-K, I believe, was issued in February of 2018. And I'm sorry, the number that I have here is the district court numbering. It's A019. A019. Okay, great. Thank you. And the defendants, we put together a chart in the district court below listing. Yeah. Okay. And the fourth point that I would like to make before moving into plaintiffs' individualized allegations of scienter is that there's no allegation during this 22-month class period that any of the defendants profited in any way by the alleged fraud. I think that substantially undercuts the inference of scienter, and Your Honor raised the issue of stock sales. I do think that that is a compelling point here as to why there's not a strong inference of scienter. So let me ask you this. Of course, they didn't buy them. They get the stock as part of their compensation. Now, they don't sell them. But if they had known, hey, oh, man, Riverside's about to, let's say, file bankruptcy. I didn't say that happened, but let's say they know that. And they go sell their stock. Isn't that insider trading, and can't they be criminally prosecuted for that? So wouldn't they be a little careful with that? I think that sort of proves our point, Your Honor, is that they didn't harbor negative information. No, they didn't want to go to prison for using negative information. That's different from harboring it. It's a different provision in the Exchange Act. It's 20. Yeah, but you see what I'm saying? Isn't that something that, I mean, it a little bit questions the issue of, well, they didn't sell it, so why wouldn't they have sold it? Well, if you're an insider and you get told something and then you go right out and sell, I mean, we've seen those prosecutions. I'm not claiming to be an expert on them, but am I missing something on that? But they acquired more stock throughout the entire class period. But all of that was compensation, right? It wasn't buying it. And that was addressed in footnote 5, page 23 of our brief and not addressed in the reply briefing. It's discussed in the – I'm probably not going to pronounce this correctly – the Zaju case. And they essentially say that retaining stock through the negative disclosures is going to raise the opposite of an inference of fraud because it suggests that you wouldn't be harboring negative information about the company that would cause their stock to drop. So with that in mind, I'd like to address – You don't have a response to my question about the insider trading problem. Well, I think respectfully, Your Honor, our response is that it's just a separate provision under the Exchange Act that they would have been – that they would bring claims against. And there are also different ways that executives can – The cite for your quote that you just made is a southern district of Texas, and it's not a Fifth Circuit case. That is correct, Your Honor. Okay. So we haven't held that not committing insider trading is somehow proof that you're not lying. Judge Higginson in the Owens v. Jastrow case, it was addressed in a footnote. I'm not going to be able to pull up the exact footnote with the papers in front of me right now, Your Honor. I don't believe it was a holding of the case, but it was suggested that the exact issue that we're discussing here would be inference against fraud. So I'd like to address the motive allegations. So plaintiff's motive allegations start and end with the Product 600 allegations. There they say that under that plan, the individual defendants were entitled to receive additional equity compensation if Six Flags modified EBITDA reached $600 million by the end of 2018. But here the plaintiff's actually alleged that Six Flags in its Q4 2018 reporting disclosed difficulties facing Riverside and took a related revenue right now. Plaintiff's alleged that it was this decision, this public disclosure of negative information that was the reason why the Product 600 target was not met. That's paragraph 269 of the operative complaint. So plaintiff's actually alleged that at the only point in time in a 22-month class period where the individual defendants could possibly have cashed in on the alleged fraud, they did the exact opposite of securities fraud and told investors truthfully that there were negative developments in China. So between that and the insider trading, there's absolutely no allegation of motive here that is viable. And as this circuit's held many times, if the allegation of motive don't hold up or there's no allegation of motive, either one, then the circumstantial allegations of scienter have to be correspondingly greater. You have to have kind of exceptional allegations of circumstantial evidence. And so I'd like to quickly touch on the internal reports. I think that's probably where we should start with the individual circumstantial allegations of scienter. So with the individual reports, there was some discussion about paragraph 250 in the weekly reports. Paragraph 250 does not say that the weekly reports were all given to the defendants. That's just not what it says. Paragraph 250 says that FE1 presented his reports to Mark Kane and Dave McKillop. Then the next sentence says that on multiple occasions he recalls Dave McKillop asking for information and presentations that would be related to Six Flags Board and Reed Anderson. That's a pretty big distinction. And I think it also makes a lot of sense. The CEO of a publicly traded company is not going to be getting weekly construction reports on something that's far less than 3% of the company's revenue. And so that's a critical point because that's the only report. What is your response to his point? Because I asked that. Like, you know, this was only 3% of the company, and yet you claim it's like 50% of the stock impact. What is your response to his point that it was so highly profitable versus, I guess, all the other Six Flags locations? Right. So, I mean, certainly I would readily admit that we shouldn't be suggesting that these parks were not at all important to the company. That's true. I mean, I would say, however, they were a very small part of the company's revenue. And the company's core operation, no doubt everyone knows, is their parks in North America. That's even alleged in the complaint. So I think that as that relates to the special circumstances analysis the Fifth Court uses that I think was first, maybe not first, but well articulated in the Diodes case, that that's just simply not enough to satisfy that factor. You have to have – to meet that factor of the Diodes case, you have to have – part of the operations have to threaten the viability of the company. So you see that in cases like the Nathan V. Zonigan case where – Sorry, I'm just – what's your argument? Because I had focused on that exact same sentence. Multiple occasions FE1 is told, I want your report so that I can present them to the defendant. Are you saying that legally that doesn't qualify as a presentation? Or what would seem to me – and do you have a case? Because it goes on to say these are highly detailed saying no progress, construction minimal. So if they got those presentations saying that, they wouldn't be able to say no progress, no delays, progress. Right. So Your Honor set out the framework in Nathan V. Bowman for thinking about these internal reports. And I think that the two different reports, the weekly reports and the monthly presentations have sort of different issues. The weekly reports, I think that the bigger issue there is that – I certainly think there are connections. There is a connection with the defendant issue that I'll discuss momentarily. But I think the bigger issue there is that we have no idea when these reports – which reports and when the reports were sent to the individual defendants. And that's a big issue for plaintiff in this case because throughout the proposed class period, there were negative disclosures. Throughout the first half of 2019, it was publicly known or repeatedly disclosed that construction was paused at Nanjing and Chongqing. And so if you just say that you have reports saying construction is not underway, we don't know when they were issued. We don't know when they were given to the individual defendants. Those might be entirely consistent with what they were telling the market. And so I think on the connection issue for the weekly reports, we don't know if it was the exact same form. We don't know the level of detail. So that speaks to what Your Honor addressed in the Nieman decision. So in the Nieman decision, there was literally no dispute that the reports and issue went to the individual defendants. They were emailed to the individual defendants. The issue there was would it be reasonable for the individual defendants to dig through the report and find the exact well-lit issue in that case? We can't even address that in this case because we don't have the level of detail with these reports. There were a lot of different parts in this international program. We don't know if this presentation was synthesized with other presentations. We don't know the form of the presentation. There's just not enough details pled. On the periodic reports, I think there's a different issue. In the periodic reports, I think that it's more of an issue of content. And I think that speaks to the first Nieman prong. And that's that all they say about the periodic reports are that they talk about construction issues and vendor payment issues. That's it. And so I respectfully, Your Honors, I don't think that the individual reports get them across the line to raise a strong inference of scientific. I think it's also important to speak quickly. And just your best circuit authority, either for the connection point or the content point? Best circuit authority, I think in terms of laying out the framework, certainly the Nieman case. In terms of, yeah, I would say that would be our best authority. I think that's the best articulation of the standard. So I'd like to quickly touch. I think I've touched on the February 2019 review, because there was a lot of discussion of that in the briefing. And I actually think that proves our point. So the February 2019 review, this is the comprehensive review that plaintiff speaks at length about in their reply briefing. They do not articulate anything of what was said during that meeting. And I think that's really important, because to take a step back, this Riverside company, they were incorporated in 1986. They're a well-known real estate developer in China. Their plan for these parks was to fund the parks from a variety of different sources. And this is all alleged in 219 of the complaint. The funding was going to come from local governments. It was going to come from equity investors. It was going to come from lenders. And so just observing problems on the ground, that's not a complete picture as to the viability of the park opening dates. You need to also understand their plans for future funding. And FE1 was just not in a position to know that information. It wasn't even invited to the meeting at which the park projected timelines were discussed. And so I think that, candidly, the February 2019 comprehensive review strongly supports an inference against Scienter. Touching quickly on core operations, we've discussed the importance of this issue to the company. Quickly, I don't think they meet the standard there. In the Niman decision, again, Your Honor addressed an issue that was admittedly important to the company. It just simply did not go to the level of being a core operation such that, you know, it threatened the viability of the company. So I think that they don't meet that factor. They don't even try to meet the first factor, nor could they. Six Flags has 2,400 employees. It's clearly much larger than the core operations inference would allow. They also do not seriously have an answer for the third and the fourth core operations factors enunciated in diodes. Those are internally inconsistent statements. All they refer to there in the reply briefing is the February 2019 comprehensive review. But they don't actually say what was said there. That's not an inconsistent statement. And they say the same thing for the readily apparent point. But they don't actually say what was said in the February 2019 review. So I think that this case clearly fails under the diodes analysis. I think with respect to executive departures, just to sort of make sure we talk about everything on SciENter, I think it's pretty clear at this point that none of the executive departures were actually linked to the alleged fraud. And that's just simply not enough to note that executive departures happened around the same time as the disclosure of bad news. And so I'd like to go quickly to falsity and specifically on the construction progress statements. I think that that would be the next point I'd like to discuss. So there are three different earnings calls in which construction progress is discussed. There's February 2019, there's the April 2019, and then there's the July 2019. And so February 2019, there's no allegation that construction was not ongoing at that point in time. Construction was, in fact, ongoing, and that's admitted at multiple points in time in the complaint. And the context of that statement was announcing substantial, substantial negative developments at Riverside. So I don't think that you can say that those statements are false or misleading. Similarly, in April in 2019, there's no specific allegations as to the status of construction, and they were also accompanied by negative disclosures. On park openings, I think that first of all, right off the bat, the private securities litigation. You know the facts here better. I thought April was when he said there were no delays. Delays in park openings? Well, no delays in the parks. Right, and I don't think Plaintiff has pleaded with particularity what would have happened between February 2019 when they announced a 12-month delay. But how can that be? If you're telling investors there are no delays in the openings of these parks, and at the same time, the guy on the ground that you hired is saying, I'm not seeing any meaningful construction. But they had just announced two months earlier a 12-month delay in all their park openings, and so I don't think that there's any allegations specific to what happened between February— I thought it was just a two-month on the first one, end of 2019 to early 2020. That was the October disclosure, in October of 2018. The February 2019 disclosure was a 6- to 12-month delay for all the parks, and so it was a fairly substantial lengthening of the timeline. In fact, it extended the timeline so long that the timeline was longer than it was when the class period begins in April. But didn't FE1 say even that wasn't going to happen? I mean, if nobody's constructing anything, it ain't going to be a 6-month delay. It's going to be forever. And that's where I think we get back to this point of opinions versus facts, and I think that it's important to keep in mind that FE1 wasn't working with a full set of facts. He was relaying what he allegedly saw on the ground, but he didn't have any understanding as to what Riverside was or was not capable of doing in terms of generating additional funding in the future. So you're saying it doesn't take three years to build a roller coaster or whatever, a ride, or the main parts of the park, that Riverside could have run out there and gotten thousands of people and made it happen overnight? Well, I do think it's important, and I'm glad you brought that up, Your Honor, because I think that some of the allegations surrounding that were misstated. If you go to paragraph 92 of the complaint, what actually is said about construction vendors is that every single one of the manufacturers has begun to construct the rides. So right off the bat, we can just push that 3- to 5-year timeline off the table, because when FE1 shows up in May of 2018, he alleges that every single one of the ride makers have begun to construct the rides. The next point, which is directly contradictory to what counsel just said, is that he said that at that point in time they all failed to pay. That's not what it says. It says ultimately every ride was canceled. It doesn't tell you when. And so I think respectfully, both the 3- to 5-year timeline is not even attributed to FE1. It's not attributed to any ride that actually is in the six parks. I also want to ask you this on that same point, just as a summary of that point. When we get more completely into this complaint, you tell us we will not find an allegation that FE1 or anyone is making the statement that there were no rides that were being constructed out on any of these parks, and it would take three years or so for them to be built. I think at some point in time in the complaint – well, it's a little bit contradictory. At some point in time in the complaint they say that the ride vendors had stopped construction. I think at some point in time they say June. But then later on in the complaint they say that in 2019 they're speaking to all the ride vendors and that they're trying to resolve their payment issues with Riverside. So that aspect, candidly, all the allegations are a little bit internally contradictory. Well, I bet you have more you could say. Yes, Your Honor. Thank you. Would you address that last exchange we just had? Yes, Your Honor. The complaint very clearly alleges that when former employee one came onto the job in May of 2018, it was crystal clear to him from day one that they hadn't paid for the rides, the orders had been canceled, and that it was impossible to meet the timelines. These allegations are set forth in paragraphs 90 to approximately 107, and then again, particularly with respect to Scienter, in paragraphs 249 to 252. All right. With that said – and he does use the phrase day one, by the way. What? Uses the phrase day one, from the day he arrived. This was clear to him. I want to address a few points. He made the argument that they kept saying that there was a delay, and so that's good enough. First they said a few months, and then they said six to 12 months, and la-di-da. So what about that? Thank you, Your Honor. That's exactly what I was going to address. So the disclosure of negative information here neither cured the misrepresentations nor defeats an inference of Scienter because at the same time that they were announcing these delays, and the one in October was very minor, as Your Honor pointed out, the one later in February still wasn't very much, they were consistently repeating, contemporaneous with these disclosures, timetables that were impossible to meet. So, for instance, in February for the Zhejiang Park, the first one to open, the delay that was announced was that it would be mid to late 2020. Instead of late 2019, it would be mid to late 2020. That's what they announced in this supposedly sweeping disclosure in February of 2019. That's approximately 18 months. That's an 18-month timeline. It was a complete impossibility, just as it was in the beginning of the class period. So at the same time they're announcing these delays, they are reaffirming timelines that are impossible to meet. Point two. My colleague referenced some supposedly cautionary language. A few points on this. Number one, the statements at issue here are principally mixed present and future statements that are not entitled to protection under the safe harbor under Spitzberg. That said, even if there were pure forward-looking statements here, the cautionary language was totally insufficient. This court in Lormont set forth a standard for judging such language that required the defendants to very specifically disclose the clear and present danger that was materializing. That's the language from Lormont. And even in the face of what the Lormont court conceded were somewhat specific disclosures, they found that they were insufficient. The same is true here. You can look at this record up and down, including the page that my colleague cited and I just did. You will not find any disclosure that meets. Let me ask you this. I asked your opponent about, you know, this isn't the trial, and while it's a high standard, it's not the same standard as the trial. What would be the difference? In other words, if we reversed and sent it back, what else would be added to the table? What would you do to get to trial? So what we would do is we would develop documentary evidence and testimonial evidence on the questions of what the conditions were on the ground, on the questions of the cancellation of the ride orders, on the questions of what the- From their employees, from Six Flags employees and maybe Riverside. We would probably seek discovery as to Riverside, but conceivably it probably- That might be harder. Yeah, yeah, that would be harder. And the Hague process, I don't even know if China is a signatory to the Hague. It would take like- Are you going to say time to get to the reports? Yeah. So thank you, Your Honor. So the reports at issue here were specifically presented to Defendant Reed Anderson and the board. That is alleged with great specificity, and it is alleged in accordance with this court's precedence in Goldstein and Neiman. The content of those reports is crystal clear that no progress was occurring. The more periodic reports that my colleague mentioned, he said that there's a problem with the content there. But if you look at paragraph 252, there's a specific allegation stating that one of these periodic master reports specifically stated that the ride vendors hadn't been paid from before the class period. Is your allegation in 250 the periodic or the weekly? The periodic and the weekly are often covered in the same paragraphs, and those paragraphs are 106 to 107 and 249 to 252. You will find all the description there about the periodic and the weekly reports. The periodic are also called master reports. The two critical points are that they are reasonably precise with respect to content and satisfaction of the ABC arbitrage standard, and there's a specific allegation that they were presented to the speaking defendant and the board consistent with Goldstein and Neiman. I understand, Your Honor. I see my time has expired. May I just finish my sentence? You have been disrupted at times. Why don't you make your point? Thank you very much. Judge Haynes, you said that this is a case where it appears that the allegations are reasonably particularized but not necessarily perfect. I understand that the standards for these cases, particularly in this circuit, are tough, but they're not impossible. It cannot be that there's a case where the former employee was directly responsible for the facts at issue, gave specific reports about what was said and to whom and what existed that are corroborated by a photograph from the beginning of the class period, his own resignation letter, and the events that ultimately occurred. It cannot be at the pleading stage that that is not enough to push a PSLRA case past a motion to dismiss. It's not a motion for summary judgment. All right, counsel. Thank you very much, Your Honor. I very much appreciate the time.